530 A.2d 13

David E. HUGHLEY

v.

Michael T. McDERMOTT.

No. 1580, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Sept. 3, 1987.

392

Robert G. Samet (Ashcraft & Gerel, on brief), Rockville, for appellant.

Steven R. Migdal (Manis, Wilkinson, Snider and Goldsborough, Chartered on brief), Annapolis, for appellee.

Argued before ROSALYN B. BELL, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

David E. Hughley appeals from a summary judgment rendered against him by the Circuit Court of Prince George's County in the defamation action he filed against Michael T. McDermott, the appellee. We disagree with the hearing judge's conclusion that the pleadings, depositions, answers to interrogatories, admissions and affidavits filed in the proceeding showed that there was no genuine dispute between the parties as to any material fact and that the appellee was entitled to judgment as a matter of law. Consequently, under Rule 2–501, summary judgment was not appropriate, and we shall vacate that judgment and remand the case for trial.

We restate the questions presented by the parties as follows:

1. Did the appellee enjoy an absolute privilege in publishing the allegedly defamatory matter because of appellant's actual or implied consent to its publication?

2. Was the content of the publications actionable as defamation?

3. Did the appellee abuse the qualified privilege he enjoyed to publish the defamatory matter concerning the appellant?

We address these issues in the context of the role of the court in hearing a motion for summary judgment, which the

Court of Appeals succinctly described in *Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980):

> The function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to determine whether there is a dispute as to a material fact sufficient to provide an issue to be tried. *Peck v. Baltimore County,* 286 Md. 368, 410 A.2d 7 (1979); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 231, 401 A.2d 1013 (1979); *Dietz v. Moore,* 277 Md. 1, 4–5, 351 A.2d 428 (1976), and cases there cited. All inferences must be resolved against the moving party when a determination is made as to whether a factual dispute exists. This is true even if the underlying facts are undisputed. *Peck,* 286 Md. at 381 [410 A.2d 7]; *Honaker,* 285 Md. at 231 [401 A.2d 1013]; *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 217, 339 A.2d 664 (1975); *James v. Tyler,* 269 Md. 48, 53–54, 304 A.2d 256 (1973); *Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 14, 155 A.2d 691 (1959); and *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). We have observed that the function of the trial judge on such a motion is much the same as that which he performs at the close of all the evidence in a jury trial when a motion for a directed verdict or a request for peremptory instructions makes it necessary that he determine whether an issue requires resolution by a jury or may be decided by the court as a matter of law. *Honaker* [285 Md.] at 232 [401 A.2d 1013], citing *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979). In *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970), cited in *Peck, Honaker* and *Porter,* we said, "[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact."

The record before the hearing judge discloses the following "facts."

The appellant applied to the Maryland-National Capital Park and Planning Commission (MNCPPC) for the position of a Park Police Officer in October of 1981. He was accepted as a Park Police candidate on August 9, 1982. At that time he was advised that he would have to complete candidate training school, as well as a 12 month probationary period before final acceptance as a Park Police Officer. He worked as a police dispatcher through November of 1982 and then entered the Police Academy in Prince George's County. After completing his training at the Academy in April of 1983, he began field patrol training. When the appellant learned that he might be transferred to the horse mounted training unit, he wrote to Captain George Klotz, who was the commanding officer of that unit. He advised Captain Klotz that he had "no love of horses," and would be uncomfortable in mounted training. Captain Klotz met with the appellant, and the appellant explained his reservations about working with horses, relating his limited personal experiences with horses which included vivid childhood recollections of falling off a pony and of a disfiguring injury suffered by his uncle who was kicked in the face by a horse. Nevertheless, Captain Klotz informed the appellant that he was a "natural" for mounted training because he "was bowlegged and skinny," and convinced the appellant to "try" the mounted unit. He began training with the mounted unit on August 15, 1983.

The appellant's first contact with horses precipitated the onset of nausea which plagued the appellant whenever he rode a horse or was in a stall with one. His symptoms progressed from "mild stomach problems" to vomiting. At first the appellant was determined to overcome his fear which he felt produced the physical discomfort he experienced. At the conclusion of the first week of training the appellant informed Captain Klotz that he was "uncomfortable." On the morning of Monday, August 22, 1983, the appellant had stomach cramps and diarrhea, and called in sick. On the following Tuesday and Wednesday he participated in the program but advised his supervisors of his

condition. The appellant was absent from work from August 25 until September 6 because he was experiencing leg, back and hip pain from riding horses. The appellant sought medical treatment from Dr. Gary Jones at his group health association for this problem.

When he returned to work on September 6, 1983, the appellant again spoke with Captain Klotz who insisted that the appellant complete mounted training, notwithstanding appellant's pleas that his illnesses were related to contact with horses. Later that day the appellant went to see Dr. Ann L.B. Williams, another physician at his group health association. On September 7, 1983, Dr. Williams, after consulting a psychiatrist, wrote a letter to MNCPPC on the appellant's behalf which recommended that the appellant be excused from mounted training because of his "extreme anxiety with associated physical symptoms" when around horses.

On September 12, 1983, appellant was summoned to appear before Lieutenant Robert Fox of the mounted unit. After they discussed the problems which appellant had experienced with horse mounted training, Lieutenant Fox told appellant that he would have to see the appellee. Two days later appellant received a telephone call from Lieutenant Fox advising him to report for an appointment with appellee that evening.

The appellee, a psychologist, had contracted with MNCPPC to act as its consultant and to provide counseling and referral services for its employees who needed help in resolving emotional problems which affected their work. The appellee met with the appellant for approximately 30 minutes on September 14, 1983.

At that meeting the appellant described his above mentioned unhappy childhood experiences with horses, and his observations as a Park Police candidate that several mounted officers had injured their knees as a result of horseback riding accidents. He chronicled his physical reactions to horseback riding and to being in a stall with a horse. He

told the appellee that Captain Klotz insisted that he ride, and that other officers referred to the captain's methods of training as "Gestapo tactics." The appellee advised the appellant that he believed that the appellant had a real phobia of horses and that he would recommend his transfer from mounted training, but Colonel Leslie had told the appellee that if the appellant didn't ride, the appellant would be fired. The appellant informed the appellee about Dr. Williams' letter and that she had consulted a psychiatrist before rendering an opinion. The appellee suggested hypnosis to treat the appellant's phobia. The appellant refused this suggestion. The appellee insisted that he was going to recommend treatment. The appellant responded, "you are the psychiatrist, you can recommend anything you want to." The appellee responded, "I will do that, then.... They told me you had an authority problem but I don't think you have one, I don't think you are abnormal." Finally, the appellee agreed to provide a copy of his diagnosis to the appellant.

On September 29, 1983, the appellant was ordered to appear before Major Richard Belt of MNCPPC, Larry Brownlee of the Fraternal Order of Police, and the appellee. The appellee opened the meeting by stating that he had advised Major Belt that appellant's phobia of horses was real. Appellee next stated that he and appellant had agreed that appellant would submit to hypnosis to treat his phobia. At that point appellant interrupted and advised those present that he had not agreed to hypnosis. That contradiction precipitated an argument between appellant and appellee, and the meeting deteriorated. The appellee told the appellant to sign a "release" for his lawyers before leaving the meeting. The appellant complied. That document, preprinted with blanks which were completed in handwriting, is entitled "Consent for Release of Confidential Information." As completed and signed on September 29, 1983, it provided:

> I do hereby authorize Michael T. McDermott, Ph.D. to disclose to Major Belt the following information: Diagno-

sis and Recommendations for the purpose of suitability for mounted training.

In retaliation for the embarrassment which appellant's contradiction of appellee's report to his clients at the September 29, 1983 meeting had caused appellee, on October 4, 1983, the appellee wrote to Major Belt:

At the request of Lt. Fox, I conducted an evaluation of POC David Hughley on September 22, 1983.[1] As an outcome of this evaluation, a meeting was scheduled with you and Mr. Hughley on September 29, 1983. The purpose of these meetings was to determine if POC Hughley suffers a phobic reaction to horses which prevents him from receiving training in the Mounted Unit.

It is my opinion based on the session with Officer Hughley and conversation with other officers that no such phobic reaction exists and the symptoms of anxiety (stomach cramps) are presentations of false and grossly exaggerated symptoms. The symptoms appear to be produced to avoid working in the Mounted Unit and specifically to avoid working under the command of Captain Klotz. In a word, this is termed "malingering." Most notable in the process of arriving at this diagnosis was POC Hughley's lack of cooperation with the evaluation and prescribed treatment regimen.

I will supply you with a full detailed explanation of these findings in the near future. If I can be of further assistance in this matter, please feel free to call me.

As he had promised, the appellee supplemented that correspondence on October 22, 1983. On that date he related to Major Belt:

This report will elaborate on my letter of October 4, 1983 regarding POC Hughley in which I reported my findings that he was "malingering" in regard to work on the Mounted Unit.

---

1. Both the appellant and the appellee in their deposition testimony stated that the date of this interview was September 14, 1983.

I met with POC Hughley at my private office on September 22, 1983 [2] at the request of Lt. Fox. In his communication with me Lt. Fox indicated that POC Hughley was being sent to me because he had developed a sudden and severe phobic response to horses. Lt. Fox also indicated that POC Hughley had been riding horses for over two weeks when the symptoms occurred and there was some concern that the onset of symptoms was a scheme on POC Hughley's part to get out of the Mounted detail.

In my meeting with POC Hughley he came across as quite anxious, deferential, and eager to please. He detailed the severe stomach cramps he developed around horses and communicated the diagnoses of his doctor at GHA. He could not explain why initially he had been able to ride horses without experiencing such symptoms. Throughout the interview he repeatedly remarked how difficult it was to work for Capt. Klotz because of the Captain's disciplined approach to training and running the unit. Often these comments were quite bitter, referring to the Captain as the equivalent of a "Nazi." He also stated that riding was "hard work" (physically taxing) and that it left him quite tired. Upon further exploration of these issues with POC Hughley it surfaced that his stomach cramps first emerged when he was ordered to clean the stables. Repeatedly he told me of the instances where he had to go home sick and in each case prior to the onset of cramps there was a direct order from a superior officer. I told POC Hughley that I thought his problem was more related to authority figures that [sic] horses, which he denied. So I invited him to participate in one of two psychotherapy programs which have proven extremely effective in the treatment of phobias (either hypnotherapy or systematic desensitization). POC Hughley agreed to pursue the hypnotherapy program and I

---

2. See footnote 1.

told him I would talk to his superiors about this plan to resolve the horse phobia problem.

On September 27, 1983, as you recall Major, I met with you and outlined the treatment plan for POC Hughley and proposed how his pursuit of treatment could be used to settle the matter. If he went for treatment and it was not helpful he would not continue with Mounted Training, however, his participation in treatment would let us know that he was serious in his attempt to resolve this matter. After the interview I spoke with three officers from the Mounted Unit. In private conversation each of them indicated that they thought POC Hughley was "faking it" because he did not like the Unit nor the Unit commander and had voiced this sentiment quite frequently.

On September 29, 1983 POC Hughley, FOP Representative Brownlee, and I met with you to resolve this matter and discuss treatment. In this meeting Hughley refused treatment and denied that he had agreed to it in my earlier meeting with him. In fact his entire tone had changed from one of deference to open hostility, excitability, and tension. He argued vociferously with me about the treatment and lied outright about our reaching an agreement. He was also quite argumentative about the condition of his employment although I was not trying to discuss that with him. When I told him he was undoing the agreement we had reached, he concurred and said that he would not honor that agreement.

Based on his irascible mood, refusal to cooperate in any way to alleviate this situation at the Mounted Unit other than to be removed, the symptomatology occurring only when given an order, and his stated dislike of the Unit commander, I was forced to conclude that this was not a bona fide phobia but a manipulation to get out of a work assignment he did not like.

Beyond the issues in this incident, one must speculate on the viability of such an officer to be relied upon in the future to follow orders and deal with your organization in a forthright and honest manner. I would also question

his ability to deal with authority in an orderly way and become a contributing member of the force. To date his actions have been a severe drain on all involved from supervisory personnel to fellow officers. The manipulations he demonstrated indicate there may be more pathological character issues involved here than just contempt for superiors. Other than with criminal elements, I have not seen an individual lie so boldly or so vehemently when to cooperate or to be truthful would only be in his best interest. In sum, one must wonder about his ability to be a police officer and carry out that task responsibly and honestly.

In summary I find that POC Hughley does not suffer from a phobia to horses which prevents his working in the Mounted Unit. I did find that he was trying to avoid working in the Unit and specifically avoiding the command of Capt. Klotz. His exaggerated symptoms are false presentations aimed at reassignment.

If I can be more detailed or of further assistance in this matter, please call me.

The appellant was notified on October 18, 1983 of MNCPPC's intention to fire him, and he was officially terminated on December 2, 1983.

## I.

Appellee contends that his publication of any defamatory matter in his letters of October 4 and 22, 1983, was absolutely privileged because the appellant consented to such publication. He posits that the record before the hearing judge indisputably showed that, (1) the appellant, at the time of his appointment with the appellee on September 14, 1983, was aware of the fact that the appellee would be reporting his diagnosis and recommendations with regard to the appellant's suspected phobia to the officials at MNCPPC, (2) the appellant implicitly consented to a lack of confidentiality in connection with that meeting by participating in the interview, and (3) the appellant expressly consented to the contents of appellee's reports to his employer by

requesting a copy of the appellee's reports and by execution of the "Consent for Release of Confidential Information" on September 29, 1983. The hearing judge rejected the appellee's defense based upon absolute privilege as do we.

In *Exxon Corp. v. Schoene*, 67 Md.App. 412, 419–21, 508 A.2d 142 (1986), we found it unnecessary to decide whether in this State an absolute privilege is accorded a publisher of defamation where the party defamed had consented to such publication. We did, however, note the limitations on the application of such an absolute privilege where it is recognized:

> There is authority recognizing an absolute common law privilege for defamation where the party defamed consents to its publication. *Williams v. School District of Springfield R–12,* 447 S.W.2d 256 (Mo.1969), *overruled on other grounds, Bass v. Nooney Co.,* 646 S.W.2d 765 (Mo.1983); *Costa v. Smith,* 43 Colo.App. 251, 601 P.2d 661 (1979). The Restatement (Second) Torts, § 583 (1977), adopts such an absolute privilege in these terms:
>
>> [T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.
>
> Comment d. under that section indicates the limits on the applicability of this privilege as follows:
>
>> The extent of the privilege is determined by the terms of the consent. These again are to be determined by the language or acts by which it is manifested in the light of the surrounding circumstances.
>>
>> *     *     *     *     *     *
>>
>> It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory.

*Id.* at 420, 508 A.2d 142.

Assuming that the *Restatement* view would be adopted in this jurisdiction, the record before the court, when viewed

most favorably to the appellant, simply fails to establish a case for application of the privilege.

■ Appellant did not volunteer to see the appellee; he was ordered to that interview by one of his supervisors, Lieutenant Fox. Moreover, at the conclusion of the interview, appellant was advised by appellee that his phobia to horses was real and that the appellee would recommend to MNCPPC that appellant be transferred from the mounted unit. Finally, at the beginning of the meeting on September 29, 1983, appellee reported to those present that appellant's phobia was not feigned. Given these "facts," appellant could not reasonably be charged with knowledge either of the language of appellee's reports, or that appellee's reports would be defamatory when he consented to their publication.

## II.

■ Appellee argues that the summary judgment of the court should be affirmed because his letters of October 4 and 22, 1983 contained only expressions of his opinions following his professional evaluation of the appellant. We are not persuaded.

Accepting, as we must, appellant's version of what occurred on September 14, 1983, the appellee diagnosed the appellant's condition as a genuine phobia to horses and advised him that he would recommend his transfer from the mounted unit. Appellee repeated his diagnosis at the commencement of the meeting on September 29, 1983. After appellant contradicted appellee's report at the meeting that appellant was willing to undergo hypnosis as a treatment for his phobia, they argued, and the meeting abruptly ended. Appellee in his letters which followed that disagreement knowingly falsified his earlier diagnosis. That knowing falsehood is the basis of the appellant's cause of action. *Berkey v. Delia, supra,* is apposite. In that case the Court of Appeals reversed a summary judgment in favor of the defendant in a defamation action. There the plaintiff, a county police officer, had stopped the defendant's automo-

bile for speeding and issued the defendant a citation. The defendant, a licensed psychiatrist, thereafter addressed a letter on his professional letterhead to the chief of the county police complaining of the plaintiff's actions at the time of the traffic stop. After reciting his version of the plaintiff's conduct, the defendant wrote:

> I regard his behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punative [sic]. I neither look nor behave like a fugitive, but I, as well as my wife and son, were treated by Private Delia as such.

> Partly because of my professional background and training, I question if this young officer is mentally deranged, if he is psychopathic and/or pathologically sadistic. This letter is to formally request a mental evaluation of Private Delia.

*Id.* 287 Md. at 307–08, 413 A.2d 170.

Emphasizing the role of the trier of fact in a defamation action, the Court reasoned:

> We have said relative to expert witnesses that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. *See, e.g., County Council v. District Land*, 274 Md. 691, 704, 337 A.2d 712 (1975), and cases there cited. It is apparent that Berkey [the defendant] regards Delia's "behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punitive" upon the basis of his own observation of this incident. If the trier of fact were to determine that Berkey spoke a calculated untruth in giving his version of the incident, the version which is the basis for Berkey's conclusion relative to Delia's mental condition, then a trier of fact could conclude that Berkey spoke with reckless disregard for the truth when he used the adjectives which he did to characterize Delia's behavior on this occasion.

*Id.* at 330, 413 A.2d 170.

Likewise, Comment c. to § 566 of the Restatement (Second) of Torts (1976) points out that a defamatory communication

may consist of a statement in the form of an opinion where the defendant bases his expression of a derogatory opinion on his own statement of false and defamatory facts. *See also A.S. Abell Co. v. Kirby*, 227 Md. 267, 280–81, 176 A.2d 340 (1961) and *Kapiloff v. Dunn*, 27 Md.App. 514, 525, 343 A.2d 251 (1975), *cert. denied*, 276 Md. 741, *cert. denied*, 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 832 (1976). In the case *sub judice* the record before the hearing judge would support a finding by the trier of fact that the statements of the appellee, although couched as expressions of opinion, were calculated untruths which adversely affected the appellant's employment and were therefore defamatory. *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172, 400 A.2d 1117 (1979); *Leese v. Baltimore County*, 64 Md.App. 442, 473–75, 497 A.2d 159, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985); *Mareck v. Johns Hopkins University*, 60 Md.App. 217, 223, 482 A.2d 17 (1984), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985).

### III.

In granting the appellee's motion for summary judgment the hearing judge rested his decision on the ground that appellee enjoyed a qualified privilege for the defamatory statements he made in his letters of October 4 and 22, 1983 and that there was no evidence of an abuse of that privilege. We hold that he erred in his second conclusion.

The appellee, as a consultant retained by the appellant's employer to examine the appellant, enjoyed a qualified privilege to communicate defamatory information derived from that examination to the employer. *General Motors Corp. v. Piskor*, 277 Md. 165, 172, 352 A.2d 810 (1976); *Exxon Corp. v. Schoene, supra*, 67 Md.App. at 421–22, 508 A.2d 142. The parties have no dispute with regard to the existence of that privilege. We endorse their accord since the contents of the appellee's reports concerning the appellant were within the context of MNCPPC's legitimate interest in the fitness of appellant to perform as

its employee and the evaluation of that fitness which appellee had been engaged to undertake.

It is well settled, however, that the qualified privilege accorded to a defamatory communication published within the employer-employee relationship is defeasible where the publication is made with knowledge of its falsity or with reckless disregard for its truth. *Marchesi v. Franchino,* 283 Md. 131, 135–36, 387 A.2d 1129 (1978); *Exxon Corp. v. Schoene, supra,* 67 Md.App. at 422, 508 A.2d 142; *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 31–32, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985); *Mareck v. Johns Hopkins University, supra,* 60 Md.App. at 224–25, 482 A.2d 17. Furthermore, where there is any evidence of such knowing falsity or reckless disregard for truth, the issue of whether the qualified privilege has been lost by its abuse must be resolved by the trier of fact and not as a matter of law by the court. *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 600, 350 A.2d 688 (1976); *Happy 40, Inc. v. Miller, supra,* 63 Md.App. at 34, 491 A.2d 1210; *Mareck v. Johns Hopkins University, supra,* 60 Md.App. at 227, 482 A.2d 17. Since there was disputed evidence before the hearing judge in the instant case as to whether the appellee defamed the appellant in his letters of October 4 and 22, 1983, with knowledge that the information contained in those communications was false, the issue of appellee's forfeiture of his privilege by abuse was not one which could be resolved by summary judgment.

JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY THE APPELLEE.