537 A.2d 1196

**ST. LUKE EVANGELICAL LUTHERAN
CHURCH, INC., et al.**

v.

**Ginny Ann SMITH.**

**No. 72, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

March 3, 1988.

Certiorari Granted June 24, 1988.

354

H. Patrick Donohue, Rockville (Armstrong, Donohue & Ceppos, Chartered, on the brief, for appellant, St. Luke Evangelical Lutheran Church, Inc.).

Ellen A. Efros, Washington, D.C. (Vorys, Sater Seymour & Pease and John A. DiNucci on the brief, for appellant, Buchenroth).

Keith A. Minoff (Glenn M. Cooper, Mindy G. Farber and Paley, Rothman & Cooper, Chartered, on the brief), Bethesda, for appellee.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

GARRITY, Judge.

This appeal arises out of a church employee's defamation and invasion of privacy suit, which was tried before a jury in the Circuit Court for Montgomery County (Judge Stanley Frosh presiding). Upon finding that an assistant pastor of the church had acted with malice while acting within the scope of his employment, the jury returned a verdict on both counts against the church and its assistant pastor for compensatory and punitive damages.[1]

Appellant St. Luke Evangelical Lutheran Church, Inc. (St. Luke) raised only one issue which we will need to review in this appeal:

Whether the trial court committed reversible error in granting plaintiff eight peremptory strikes.

Appellant Rev. David M. Buchenroth (Pastor Buchenroth) posits the following issues:

1. Whether the trial court erred in instructing the jury that Ms. Smith was not a public figure.

2. Whether the trial court committed reversible error in failing to instruct properly on the attachment of and burden of proof as to a qualified privilege.

3. Whether, as a matter of law, Pastor Buchenroth acted with malice.

---

[1]. The jury assessed compensatory damages at $228,904.01. The jury further assessed punitive damages in the amount of $105,875.00 against St. Luke and $2,000.00 against Pastor Buchenroth.

## FACTS

Shortly after graduating from the University of Maryland in 1983, Ms. Ginny Ann Smith (Ms. Smith) was hired as the Associate Director of Youth Ministry at St. Luke's. She had been an active member of the church since childhood and had participated in many church-sponsored activities.

At the time Ms. Smith was hired, St. Luke had three pastors, Senior Pastor Raymond Shaheen, Associate Pastor David R. Shaheen (Pastor Shaheen) and Assistant Pastor David Buchenroth (Pastor Buchenroth). As part of her responsibilities, Ms. Smith worked alongside Pastor Shaheen as Administrative Assistant for Crossroads, a conference of church youth from throughout the Maryland Synod of the Lutheran Church, and Tent Troupe, a drama group sponsored by St. Luke which traveled four months a year. Ms. Smith had been highlighted in the St. Luke Messenger, a weekly journal, on two occasions for her continuing contributions to the church.

In February, 1984, Ms. Smith went on a church-sponsored trip to the Holy Land with other members of the church, including Pastor David Shaheen and one of his sons. In Ms. Smith's absence, Pastor Buchenroth had occasion to go into her office in search of a file regarding an upcoming church event. While searching, he discovered a file marked "DRS–GAS" which contained personal correspondence from Pastor Shaheen to Ms. Smith. He removed the file and went through its contents as he "was curious as to what the correspondence was." After examining the letters and notes contained in the file, Pastor Buchenroth concluded that they confirmed his suspicion that Ms. Smith and Pastor Shaheen were involved in a sexual relationship. While seeking advice from a trusted co-worker, Mrs. Joan Patton, Pastor Buchenroth allowed her to examine the file. Mrs. Patton confided to Pastor Buchenroth that she had recently come upon Pastor Shaheen and Ms. Smith as they were engaged in an embrace. She thought it best to tell Pastor Shaheen's wife, Ellen, of the developing situation as evidenced by the nature of the notes and letters.

Shortly thereafter, Pastor Buchenroth advised both Pastor Shaheen's wife and Mrs. Virginia Smith (Ms. Smith's mother) that he believed that Pastor Shaheen and Ms. Smith were having an affair. He explained to Mrs. Smith that by an "affair," he meant that they were "sleeping together." As he had provided Mrs. Shaheen with the background of his belief, Pastor Buchenroth provided Mrs. Smith with specific times and places where he thought the liaisons had been taking place. He further offered his belief that Pastor Shaheen and Ms. Smith might not return from the trip.

After Ms. Smith and Pastor Shaheen returned from the Holy Land, they were asked to attend several "counseling sessions" which had been arranged by the senior pastor in an effort to promote a "healing process." In addition to Senior Pastor Raymond Shaheen and his son Pastor David and Ms. Smith, other persons in attendance included Ellen Shaheen, Virginia Smith, Dr. Cheryl Wilhoyte (Chairperson of St. Luke's Committee on Staff) and Rosemarie Rhyne (St. Luke's Director of Counseling Ministry). The group discussed the letters that had been found and the accusations which had been made. Mrs. Shaheen had reviewed the correspondence earlier and had thoroughly discussed the situation with her husband.

Based primarily on Mrs. Shaheen's belief that the "affair" between her husband and Ms. Smith was not of a sexual nature, Pastor Buchenroth acknowledged to the group that he no longer believed the affair to have been sexually oriented. He further apologized to Ms. Smith and to Pastor Shaheen for "any pain that might have been caused" by his accusations. In an effort to avoid having the charges leaked to the congregation, everyone in the group, including Pastor Buchenroth, vowed to keep the entire matter confidential.

Because of the obvious discordant working relationship that developed following his accusations, Pastor Buchenroth made an appointment to see the Bishop of the Maryland Synod to request a transfer. Before meeting with the Bishop, however, Pastor Buchenroth visited the home of his

personal friends, Mr. and Mrs. Rupert, both of whom were active members of the St. Luke congregation. Mr. Rupert also served as an officer in the church. After explaining that he was breaking a vow of confidentiality, Pastor Buchenroth divulged to the Ruperts that he had come across a file of letters written by Pastor Shaheen to Ms. Smith and what had taken place in the aftermath of his discovery. In essence, Pastor Buchenroth "bared his soul" to the Ruperts and "described to them how we got in the predicament we were in." Contrary to his representation earlier that he had made to the Committee on Staff that he no longer believed the relationship to have been of a sexual nature, however, he related specific instances in which Ms. Smith and Pastor Shaheen had opportunities to be alone while traveling. He then postulated that such a relationship was inappropriate between a married pastor and a staff member. Pastor Buchenroth further related to the Ruperts that he was dissatisfied with the lack of progress that the Committee on Staff was making in resolving the situation and that he did not want to be the "fall guy."

As a result of his conversation with Pastor Buchenroth, Mr. Rupert contacted Mrs. Patton, Senior Pastor Shaheen, Dr. Wilhoyte, and Stanley Benning, a member of the Committee on Staff who also served with Mr. Rupert on the Board of Governors for Hallowood.[2] Mr. Rupert warned Mr. Benning that unless some action were taken to prevent Pastor Shaheen and Ms. Smith from both participating in Tent Troupe, he would contact the parents of the children who participated in the drama group and tell them what Pastor Buchenroth had alleged.

Due to Mr. Rupert's threat, beginning in late May, 1984, the Committee on Staff began to conduct a long series of meetings addressing the issue. At several of these meetings, each of the persons involved was required to answer questions posed by members of the Committee. Pastor

---

2. Hallowood was the name of a building located in the countryside where the theatrical group practiced.

Buchenroth appeared and told the Committee why he believed that there was an affair between Ms. Smith and Pastor David. He reported to the Committee, as he had to Virginia Smith and the Ruperts, the specific times and places where he thought the affair had been taking place.

When asked to relate her perception as to what Pastor Buchenroth had described regarding the nature of the relationship between Ms. Smith and Pastor Shaheen, the chairperson of the Committee on Staff, Dr. Wilhoyte, testified:

> Based on the reference to the October Philadelphia trip,[3] to an incident that occurred in Hunt Valley,[4] to the amount of time spent together, and to his decision to go to Mrs. Shaheen with the letters and indicate what he believed about the relationship, I felt that all of that from Pastor Buchenroth had led him to believe that there was an affair between Pastor David Shaheen and Ginny Ann Smith.

After the Committee met several times, a proposal that Ms. Smith be placed on administrative leave, because of the charges Pastor Buchenroth had made, was adopted and then deferred until the next meeting. On June 18, 1984, Ms. Smith appeared before the Committee on Staff and was requested by Senior Pastor Shaheen to relinquish her responsibilities voluntarily. Although continuing to express that the "charges" against her were false, Ms. Smith advised the group that she would voluntarily resign but would continue to serve as a member of the Tent Troupe staff. She then left the meeting and returned to Hallowood to rejoin Tent Troupe. Later that evening, Dr. Wilhoyte went to Hallowood and advised Ms. Smith that the Committee would not accept her offer of resignation.

---

3. A Youth Ministry Conference in Philadelphia wherein Pastor Buchenroth reported seeing Pastor Shaheen and Ms. Smith but once during a 24–hour period.

4. While attending a conference at Hunt Valley, Pastor Buchenroth telephoned Pastor Shaheen's room and Ms. Smith answered.

The Tent Troupe staff was then made aware of the charges that had been made and the Ruperts' pending threat to tell all Tent Troupe parents about Pastor Buchenroth's allegations unless Ms. Smith were prevented from going on the tour to New England. The next day, a statement was read by the Tent Troupe staff which described the allegations that had been made of "an affair" and reported the actions which had been taken by the Committee on Staff against Ms. Smith and Pastor Shaheen. After the statement was read, it was decided that the drama group would go on tour with its entire staff, including Pastor Shaheen and Ms. Smith.

After Ms. Smith returned from the tour in late July, the Church Council advised her by letter that it would accept her resignation which the Committee on Staff had rejected. When this attempt to oust Ms. Smith failed, the church formed a Special Committee, without the knowledge of the chairperson of the Committee on Staff, and recommended that Ms. Smith's position be abolished immediately. The recommendation was adopted and approved by the Church Council.

## I. PEREMPTORY CHALLENGES

Co-defendant/appellant St. Luke challenges the authority of the trial judge to have awarded the plaintiff/appellee eight peremptory challenges rather than four. There is no question that in Maryland each party to a civil action is permitted four peremptory challenges to the venire of prospective jurors. Md.Cts. & Jud.Proc.Code Ann. § 8–301(d) (1987 Supp.). Similarly, Md.Rule 2–512(h) provides:

> Each party is permitted four peremptory challenges plus one peremptory challenge for each group of three or less alternate jurors to be impanelled. For purposes of this section, several plaintiffs or several defendants shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them

separate peremptory challenges *not exceeding the number available to a single party....* (emphasis added).

In the case at bar, therefore, as party plaintiff, Ms. Smith was permitted four peremptory challenges and each co-defendant was initially entitled to share four peremptory challenges. On motion by the co-defendants, however, the trial judge ruled that their interests were sufficiently adverse to justify the award to each of four separate peremptory challenges. The trial judge then awarded *sua sponte,* over objection of co-defendant St. Luke, four additional peremptory challenges to the plaintiff. Thus, the end result was that each side, rather than each adverse party, had a total of eight peremptory challenges.

In explaining his decision to also award additional strikes to the party plaintiff, the trial judge stated:

The reason I suggested that we add another four strikes to [the party plaintiff] is that we have plenty of jurors and in an effort to make sure that everybody gets a fair shake, if they want to strike eight, I do not see any problem with it. If you [co-defendants] want to strike eight, you take your four and four and you get eight to make sure everybody feels comfortable with the jury.

Thereafter, the following colloquy took place between counsel for St. Luke and the trial court.

MR. DONOHUE: I understand the Court's comment, but I would object to that for the record because I think there should be four allotted per interest.

THE COURT: It normally would be, but I see a conflict between two of you, and I do not want to impose your having to agree with a potential of conflict on only four, and I feel the only fair thing to do is to give them another four as well. Okay.

MR. DONOHUE: Thank you, Your Honor.

Appellant St. Luke argues, in essence, that as Ms. Smith, an adversarial party, "had twice as much to say about who would not sit on the panel as any other party," it was not

assured a fair trial decided solely on the basis of the evidence.

Ms. Smith admits that the effect of the court's ruling was to allow her "to have twice as much to say about who sat on the jury than either defendant." She explains, however, that

> this is always the case under Rule 2–512(h) where, as here, there are twice as many defendants as plaintiffs *unless* the court determines that adverse or hostile interests justify allowing separate peremptory challenges to each party.

Ms. Smith concludes, therefore, that she

> would still have had twice as much to say about who sat on the jury than either St. Luke or Pastor Buchenroth even if the court had followed the rule to the letter and awarded four strikes to each side.[5]

The Court of Appeals was faced with a somewhat similar problem in *King v. State Roads Commission*, 284 Md. 368, 396 A.2d 267 (1979). In that case, the plaintiff and defendant each received four peremptory challenges. After the challenges were exercised, 17 veniremen remained. The trial judge then struck five additional names to obtain a panel of 12 jurors. In remanding the case to determine if an objection had been timely noted, the Court of Appeals observed:

> [T]his selection method impaired the effectiveness of these parties' peremptory challenges to the extent that the trial judge, with five strikes, had more to say about who would not sit on the panel than either of the parties. In our view, unless waived, the only adequate remedy for

---

**5.** Although the record submitted to us did not include the jury strike list, the arguments by the parties suggest that all available strikes were used. In the absence of any denial by Ms. Smith that she had in fact exercised the eight peremptory strikes allotted to her by the court, we shall infer that they were utilized, and decide the opinion accordingly.

such a clear violation of Rule 543 is a new trial before a correctly selected jury.[6]

*Id.* at 372, 396 A.2d 267.

Writing on behalf of the Court in *King,* Judge Digges stated:

No citation of authority is needed to support the proposition, which is intrinsic to the American concept of justice, that when a jury trial is authorized, the panel should be composed of fair and impartial individuals selected from among one's peers. In insuring that such an impartial jury is chosen, a reasonable peremptory challenge right plays a vital role because it permits a party to eliminate a prospective juror with personal traits or predilections that, although not challengeable for cause, will, in the opinion of the litigant, impel that individual to decide the case on a basis other than the evidence presented.... Further, the importance of the peremptory challenge requires that any significant deviation from the prescribed procedure that impairs or denies the privilege's full exercise is error that, unless waived, ordinarily will require reversal without the necessity of showing prejudice. *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965).

*Id.* at 370–71, 396 A.2d 267.

Rule 2–512(h) clearly limits each party to a maximum of four initial peremptory challenges. In a matter involving multiple litigants the Rule permits the trial court to grant additional peremptory challenges if it "determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them separate peremptory challenges...." In order to do so, the court must make a factual finding of adverse or hostile interests. It is then totally within the court's discretion as to whether that interest justifies allowing the additional challenges. *Kloetzli v. Kalmbacher,* 65 Md.App. 595, 501 A.2d 499

---

**6.** Rule 543 served as the foundation for the current procedure regarding peremptory challenges under Rule 2–512(h).

(1985). In the event the court determines the interests to be sufficiently diverse as to justify the award of additional strikes, the Rule provides that they may not exceed "the number available to a single party." In other words, if adverse interests justify additional strikes, as was found to be the case in the matter *sub judice*, each co-defendant is to be treated as a single party for purposes of awarding peremptory challenges.[7]

In his well-intentioned effort "to make sure that everybody gets a fair shake" the trial judge decided to deviate from the established peremptory procedure and award twice as many strikes as that given to each co-defendant who were now entitled to be treated as individual parties. Our task is to determine whether the deviation was so significant as to impair the peremptory privilege on behalf of St. Luke's.

As cogently expressed by Judge Liss on our behalf in *Vaccaro v. Caple*, 33 Md.App. 413, 416, 365 A.2d 47 (1976), "the function of the peremptory challenge is to eliminate extremes of partiality and to assure the parties that the case is decided solely on the basis of the evidence."

Judge Moylan outlined the historical importance of the peremptory challenge in *Spencer v. State*, 20 Md.App. 201, 203–4, 314 A.2d 727 (1974):

> The accepted use of the peremptory challenge, as an incident to the right of trial by jury, came to the Maryland Colony with the first settlement. Its history in this State, and statutory vicissitudes, is well traced in *Turpin*

---

**7.** See also *Maryland Rules Commentary*, Paul V. Niemeyer and Linda M. Richards, Michie Co. (1984), which states:

Multi-party cases.

In cases with more than one plaintiff or more than one defendant, each side is considered as a single party for the purpose of exercising peremptory challenges unless the parties on one side are adverse to each other or have hostile interests. For example, two plaintiffs with a uniformity of interest are entitled to four peremptory challenges between them. On the other hand, two defendants who have filed cross-claims against each other have interests adverse to each other and are each entitled to four.

*v. State,* 55 Md. 462. See also *Parker v. State,* 227 Md. 468, 470–471, 177 A.2d 426 [1962], and *Brice v. State,* 264 Md. 352, 365–367, 286 A.2d 132 [1972]. Judge Gilbert discussed and analyzed in great depth the nature of the peremptory challenge in *Pearson v. State,* 15 Md.App. 462, 291 A.2d 167 [1972]. See also *Bever v. State,* 4 Md.App. 436, 439–440, 243 A.2d 634 [1968], and *Johnson v. State,* 9 Md.App. 143, 148–151, 262 A.2d 792 [1970].

The Supreme Court recognized the value of the right in *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). See also 47 Am.Jur.2d, *Jury,* §§ 233–264; 50 C.J.S., *Juries,* §§ 279–285. In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court discussed the nature of the challenge at 380 U.S. 220–221:

> "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control.... While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable.... It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,' ... upon a juror's 'habits and associations,' ... or upon the feeling that 'the bare question [of a juror's] indifference may sometimes provoke a resentment,' ... It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be." (Citations omitted).

We hold that in the case at bar, once the trial court properly determined that the interests of the two defendants were sufficiently adverse to warrant additional strikes, the court significantly deviated from the prescribed procedure and impaired the peremptory privilege of each co-defendant to be treated as a single party when it awarded twice as many peremptory challenges to the party plaintiff. As to St. Luke, therefore, the case is reversed and remanded. As Pastor Buchenroth failed to preserve the peremptory challenge issue for our review, however, we shall need to discuss the remaining issues raised by him.

## II. DENIAL OF PUBLIC FIGURE INSTRUCTION

██ During the hearing on proposed instructions, appellant's counsel proposed that the jury be advised that Ms. Smith was classified, for purposes of defamation litigation, as either a "general" or "limited" public figure. As such she would need to prove, by clear and convincing evidence, that Rev. Buchenroth had made the defamatory statements with malice. The trial judge denied the requested instruction on the ground that Ms. Smith, as a matter of law, was not a public figure. We agree.

The concept of a "public figure" was explicated by the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court held that, in an action for defamation of character, a plaintiff who is a public figure must prove, by clear and convincing evidence, that the defendant had made the defamatory statement with malice.[8] The Court further observed that:

> [the] designation of a person as a public figure may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all

---

**8.** As to conduct which constitutes malice, the Supreme Court held in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that an individual has acted with malice if he makes a defamatory statement either with knowledge that it was false or with reckless disregard as to its truth or falsity.

concepts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. *Id.* at 351, 94 S.Ct. at 3012–13.

Pastor Buchenroth argues that Ms. Smith's activities were "inextricably intertwined with the fitness of Pastor Shaheen for his position as Associate Pastor." By that means, he contends, she thrust herself into the forefront of an on-going controversy and became a public figure within the church community. The appellant avers:

> By pursuing a course of "voluntary and intentional conduct," Ms. Smith "sought to directly influence" these matters of interest to the relevant audiences. In assuming her position as Associate Director of Youth Ministry, Ms. Smith voluntarily thrust herself into the continuing question—or "general controversy"—of the fitness of the leaders of the Youth Ministry. More importantly, by engaging in an inappropriate relationship with Rev. Shaheen, she brought into question her particular fitness to serve as Associate Director of Youth Ministry. Thus, Ms. Smith can be said to have created the particular controversy in question.

> In addition, by virtue of her relationship with Rev. Shaheen, she thrust herself into the continuing question—or "general controversy"—of the fitness of the Associate Pastor for his position. In addition, she precipitated—and thus cast herself into—the particular controversy—the fitness of Rev. Shaheen—which prompted the alleged defamatory statements.

In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Supreme Court provided further guidance in determining which persons are to be deemed public figures for purposes of defamation litigation. In that case, Mrs. Firestone filed a complaint for separate maintenance; her husband counterclaimed with a suit for divorce on grounds of extreme cruelty and adultery. The

trial court granted the divorce on the grounds that neither party was domesticated, within the meaning of that term as used by the Florida courts. A reporter for Time magazine, however, indicated that the divorce had been granted due to Mrs. Firestone's cruelty and adultery. In holding that Mrs. Firestone was not a public figure, the Court stated:

> Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it.
>
> . . . . .
>
> Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did respondent freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony. We have said that in such an instance "[r]esort to the judicial process ... is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court." *Boddie v. Connecticut*, 401 U.S. 371, 376–77, 91 S.Ct. 780, 785–86, 28 L.Ed.2d 113 (1971).

*Id.* at 453–54, 96 S.Ct. at 964–65.

In a later case, *Wolston v. Reader's Digest Assn. Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the petitioner was subpoenaed to appear before a New York grand jury investigating allegations of Soviet espionage. When the petitioner failed to appear for one of the hearings, a contempt citation was issued. At no time was the petitioner ever indicted for espionage. The Reader's Digest reported, however, that Wolston had been identified as a Soviet agent and had been convicted following an indictment for espionage. In holding that Wolston was not a public figure, the Court stated:

Petitioner's failure to appear before the grand jury and citation for contempt no doubt were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44 [91 S.Ct. 1811, 1820, 29 L.Ed.2d 296] (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*. See *Time, Inc. v. Firestone*, 424 U.S., at 454 [96 S.Ct. at 965].

Nor do we think that petitioner engaged the attention of the public in an attempt to influence the resolution of the issues involved. Petitioner assumed no "special prominence in the resolution of public questions." See *Gertz v. Robert Welch, Inc.*, 418 U.S., at 351 [94 S.Ct. at 3013]. His failure to respond to the grand jury's subpoena was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue.

*Id.* at 167–68, 99 S.Ct. at 2707–08.

We find the above cited precedents controlling in the case *sub judice*. As the Court stated in *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013:

We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects

of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

In this context, we believe the trial court properly ruled that Ms. Smith had remained a private person. She did not thrust herself into the controversy surrounding Pastor Shaheen's fitness for office. Indeed, there was no such controversy until generated by subsequent events.[9] Nor do we believe, contrary to appellant's contention, that Ms. Smith should be considered to be a public figure because she protested at a church meeting against Pastor Buchenroth's appointment. Moreover, if, as postulated by Pastor Buchenroth, the purported controversy in the church community was in fact the issue concerning Pastor Shaheen's fitness to serve the congregation, Ms. Smith's pronouncements on Pastor Buchenroth's qualifications for appointment were irrelevant to such issue in any event.

## III. INSTRUCTION AS TO QUALIFIED PRIVILEGE AND ITS DEFEASANCE

As we have held that the trial court ruled correctly that Ginny Ann Smith was not to be considered a public figure, a standard of ordinary negligence applies in proving defamation. In a defamation or invasion of privacy suit, as in the case at bar, a qualified privilege may be a valid defense. *General Motors Corporation v. Piskor*, 27 Md.App. 95, 129, 340 A.2d 767 (1975). In this regard, however, the qualified privilege itself is subject to defeasance if it is found that the defamer exceeded the scope of the privilege. *Hughley v. McDermott*, 72 Md.App. 391, 530 A.2d 13 (1987). *See also Marchesi v. Franchino*, 283 Md. 131, 387 A.2d 1129 (1978); *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580,

---

9. It is axiomatic that those charged with defamation cannot, by their own conduct, create a defense by attempting to characterize the claimant as a public figure. *Harris v. Tomczak*, 94 F.R.D. 687 (1982).

350 A.2d 688 (1976); *Exxon v. Schoene,* 67 Md.App. 412, 508 A.2d 142 (1986).

■ In a matter involving the availability of a qualified privilege defense, the court, as a matter of law, is required to instruct the jury whether a qualified privilege to convey information of a defamatory nature has attached. *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 34, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985). It is then the responsibility of the jury to determine whether such privilege has been forfeited by its abuse. *IBEW, Local 1805 v. Mayo,* 281 Md. 475, 379 A.2d 1223 (1977). *See also Jacron Sales, supra.*

■ Pastor Buchenroth maintains that the trial judge committed reversible error when he ruled that a qualified privilege applied but then instructed the jury that, "there is in law the *possibility* of what we call a conditional privilege...." He also contends that the trial judge failed to instruct the jury that Ms. Smith had the burden of proving the defeasance of a qualified privilege by malice.

As to the instructions at issue the court gave the jury the following charge, in pertinent part:

Now, I tell you that there is in law *the possibility* of what we call a conditional privilege, but before I go into that, let me give you some more instructions on defamation as it means in this case. (emphasis added).

Defamation is the negligent publication of a false and defamatory statement about another. A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt, or ridicule, thereby discouraging others in the community from having a good opinion of or from associating or dealing with that person.

Negligent publication is the unreasonable failure to determine whether the statement is true or false. A defamatory statement is published when it is communicated to and understood by someone other than the Plaintiff.

The communication, as I said, must be oral or in writing or by any other means.

. . . . .

Now, as I told you, there is such a thing as a privilege when it comes to making a defamatory statement. A person who publishes a defamatory statement about another is not responsible to the other if he or she had a right to make that statement.

Now, I tell you as a qualification to that that a person does not have this right if he acted with malice, that is, with ill will, with hostility, with hatred, with lack of good faith or reckless disregard of the truth.

As stated in another way, in order to recover in an action for defamation for what this amount is due—that is, the defamatory statement of slander—the Plaintiff, Ms. Smith, must also prove by a fair preponderance of the evidence that Reverend Buchenroth knew at the time that he uttered that the defamatory statement was false, and that it defamed Ms. Smith, or he acted in reckless disregard of the falsity and defamatory nature of the statement, or he acted negligently in failing to ascertain the falsity and defamatory nature of the statement.

. . . . .

I told you that there is the *possibility* of a qualified privilege, and I explained to you when I said that a person who publishes a defamatory statement about another is not responsible if he or she had a right to make the statement. (emphasis added).

In certain circumstances a person who publishes a defamatory statement about another is not responsible to the other if he or she had a right to make the statement. Such a right is based on the concept that a speaker may avoid liability for a statement which would otherwise be defamatory if publication of that utterance advances social policies of greater importance than the vindication of the Plaintiff's interests in her reputation.

This right is also known as a conditional or a qualified privilege because under certain circumstances, the speaker—that is, the one who makes the statement—can lose that right.

I tell you that *as a general rule defamatory communications between parishioners or between parishioners and clergymen that concern matters related to the church are subject to a qualified privilege.* (emphasis added).

This rule is based on the broader rule that a qualified privilege attaches to a communication if both the speaker and the recipient have a common interest in and a duty as to the subject matter of the communication.

For example, a qualified privilege attaches to communications concerning the fitness, moral or otherwise, of clergymen for their positions, and the fitness, the moral or otherwise, or church members for membership in the church.

The instructions given in *IBEW Local 1805, supra,* were much less definitive than those related to the jury in the case at bar. In *IBEW Local 1805,* the trial judge failed to instruct the jury that a qualified privilege had attached. Instead, he left both determinations to the jury as to whether the privilege had attached and whether it had been defeased by abuse.[10] The trial judge also instructed the jury, however, on the New York Times definition of malice which, as adopted in Maryland, is equated to knowing falsity or reckless disregard of truth. *Marchesi v. Franchino, supra.*[11] Thereafter, as in the case at bar, the jury

---

10. The trial judge in *IBEW Local 1805* instructed the jury as follows: But you *may* have or you *may* find *or* you *may not* find that there was a qualified privilege for the union to say what it did in the Intercom, or you may find it went too far.... [A]nd it's up to you to determine whether or not this privilege was exceeded.... (emphasis added).

11. The Court stated in *Marchesi,* 283 Md. at 139, 387 A.2d 1129: We hold, therefore, that "knowledge of falsity or reckless disregard for truth" is the standard by which the malice required to

returned a verdict against the defendant and made a specific finding of malice.

In viewing the instructions pertaining to the attachment of a qualified privilege as a whole, we believe the instructions were correct but could have been more definitive that Pastor Buchenroth was entitled to a qualified privilege as to the defamatory statements attributed to him. Assuming error, however, we believe it was harmless in light of the fact that the jury was specifically instructed that its finding of malice would defeat the attachment of any qualified privilege. We further hold that the record reflects the jury was properly instructed as to Ms. Smith's burden of proof to show malice.[12]

## IV. SUFFICIENCY OF EVIDENCE AS TO MALICE

■ Pastor Buchenroth contends that the evidence presented to the jury was, as a matter of law, insufficient to allow the jury reasonably to conclude that he had acted with

---

defeat the conditional privilege defense is to be measured in cases of private defamation. To the extent that our prior decisions are not in accord with this holding, they are disapproved.

12. Following the submission of a reply brief by Pastor Buchenroth, the appellee filed a motion to strike various parts of it. We shall strike that portion of Pastor Buchenroth's reply brief designated as Section A.2 which raised a different issue than that previously discussed. In that section of the reply brief, Pastor Buchenroth argued, for the first time, that the trial court had incorrectly defined the type of malice necessary to defeat a qualified privilege.

In *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 459, 406 A.2d 928 (1979), we granted a motion to strike material from a reply brief under similar circumstances:

The function of a Reply Brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue each point of his appeal. We think that the reply brief must be limited to responding to the points and issues raised in the appellee's brief.... To allow new issues or claims to be injected into the appeal by a Reply Brief would work a fundamental injustice upon the appellee, who would then have no opportunity to respond in writing to the new questions raised by the appellant. Due process requires that all parties have an opportunity to reply to new issues asserted against them.... *See also Berkson v. Berryman,* 63 Md.App. 134, 492 A.2d 338, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985).

malice in making the statements which were deemed to be defamatory. He argues that his "uncontradicted testimony" compelled the finding that he believed the alleged defamatory statements to be true and not, as Ms. Smith contends, that he knew them to be untrue.

Pastor Buchenroth further asseverates, "[n]or does the evidence support any inference that [he] acted recklessly in accusing Ms. Smith of having an affair with Pastor Shaheen." He bases this contention "on a long train of indicia of which, cumulatively if not individually, would lead a reasonable person to suspect that Ms. Smith and Rev. Shaheen were engaged in an affair." In addition to the specific instances between the two that he deemed inappropriate behavior, such as the reported close embrace and affectionate conduct shown toward each other, he predicated his conclusions on the intimate expressions contained in the series of letters he had discovered in the file cabinet from Pastor Shaheen to Ms. Smith.[13]

---

13. As examples of notes which had been written by Pastor Shaheen to Ms. Smith during the Winter of 1984, one stated:

I need you—need to talk to you—have had a horrible night and am really finding it hard to cope this morning. Please be patient with me—for years I've just kept all kinds of stuff locked inside—but now I feel like I have someone to cry with, or at least let see the burden.

These frequent sleepless nights are taking their toll. There were a couple last week that were great—I slept all night long—but they are rare. I really feel exhausted—and need a soft, comforting touch.

So much has happened in recent weeks—so much. I really wish, and pray, that there will be quiet times for you and me to talk heart-to-heart. If absence makes the heart grow fonder—no wonder I feel the way I do. No one could ever feel love you like I do—
D—

Another note written shortly thereafter to Ms. Smith by Pastor Shaheen stated:

Needless to say—I didn't sleep last night—but for a different reason. I hope you did sleep—and peacefully. My mind has been filled with so much the past 2 weeks—and I've told you a lot of the things that I feel. But ... I can't let my heart be silent any longer—the things I've wrestled with all night have to do with feeling stronger about you than ever before—and it's as if our relationship is just beginning.

No one loves you more than I do—absolutely!

As previously discussed, whether a defamatory statement is entitled to a qualified privilege is a question of law for the court, but whether that qualified privilege had been abused is generally a question of fact for the jury. *Mareck v. Johns Hopkins Univ.*, 60 Md.App. 217, 482 A.2d 17 (1984). Also, as previously discussed, a qualified privilege may be lost if the publication is made with malice, that is, with knowledge of its falsity or with reckless disregard of its truth. *Marchesi v. Franchino*, 283 Md. at 139, 387 A.2d 1129.

Although Pastor Buchenroth contends that his testimony was "uncontradicted" and that he believed the defamatory statements attributed to him to be true, it is clear that his testimony was disputed. Evidence was presented to the jury that when he discussed "the affair" with the Ruperts and with the Committee on Staff, he had earlier admitted to the initial group of concerned individuals, including Pastor Shaheen's wife and Ms. Smith's mother, that he no longer believed his accusations to be correct.

We believe, therefore, that the jury, as factfinder, was presented with sufficient evidence from which it reasonably could have inferred that Pastor Buchenroth's statements had been made with knowing falsity or with reckless disregard of truth. Furthermore, although not specifically argued by Pastor Buchenroth, we believe that the jury reasonably could have concluded from the evidence submitted that Pastor Buchenroth's conduct unreasonably intruded upon the private concerns of Ms. Smith.

JUDGMENTS AS TO ST. LUKE EVANGELICAL LUTHERAN CHURCH, INC., REVERSED AND REMANDED; COSTS TO ABIDE THE RESULT OF RETRIAL.

JUDGMENTS AS TO REVEREND DAVID M. BUCHENROTH AFFIRMED; APPELLANT BUCHENROTH TO PAY HIS COSTS.