622 A.2d 175

**Melvin BUNDY**

v.

**STATE of Maryland.**

**No. 929, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 1, 1993.

Devy Patterson, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mariclaire Driscoll, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Mary Ellen Barbera, Asst. Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and MOYLAN, and JAMES S. GETTY (Retired), Specially Assigned, JJ.

MOYLAN, Judge.

The appellant, Melvin Bundy, was convicted by a Baltimore City jury of the theft of goods of a value of $300 or more. On this appeal, he raises the following two contentions:

1) That the trial judge erred in permitting the State to exercise an excessive number of peremptory challenges; and

2) That the trial judge erred in permitting the appellant's trial to go forward in his absence.

*Legislative Intent: The Meaning of "Party":*

The appellant's trial was consolidated with that of a codefendant. The two were being tried for a crime that does not carry a possible sentence of death, life imprisonment, or imprisonment for twenty years or more. Under the provisions of Md.Code Ann., Cts. & Jud.Proc. § 8–301(d) (1989), the authorized allocation of peremptory challenges, therefore, was as follows:

"In all other criminal cases, *each party* is permitted 4 peremptory challenges." (emphasis supplied).

*See also* Md.Rule 4–313(a)(1). We sympathize with the legitimate perplexity of the trial judge when called upon to apply that provision:

> "[I]t really is unclear in my mind as to what this rule means and what the purpose of the rule is."

Section 8–301(d), mirrored in Rule 4–313(a), is, indeed, unclear.

In the course of the jury selection process, *each* of the two codefendants claimed that he, as a "party," was entitled to four peremptory challenges. The trial judge correctly ruled that that was the case, but then ruled that the State was thereby entitled to a total of eight peremptory challenges, four for each codefendant.

Preliminarily, we have to note that the appellant's complaint—as he loosely phrases it—about the State's having been *awarded* peremptory challenges is beside the point. The *awarding* of excess challenges would be immaterial if, in fact, they were never utilized. In this case, the State used six of the eight peremptory challenges it was awarded. The significant error, therefore, if error it be, is not that the State was *awarded four additional* peremptory challenges to which it was not entitled but that it *actually utilized two additional* peremptories to which it was not entitled. *See St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 318 Md. 337, 344, 568 A.2d 35 (1990).

The State's response is that in a consolidated trial against two codefendants, the State is a "party" twice, once as the prosecutor of Codefendant "A" and a second time as the prosecutor of Codefendant "B." The task before us is to divine the intent of the Legislature when it used the phrase "each party" in enacting what is now Md.Code Ann., Cts. & Jud.Proc. § 8–301(d) (1989). That intent, of course, also controls the meaning of the same phrase in the implementing Rule 4–313(a).

### The 1973 Meaning of "Party"

Ch. 2, § 1, Acts of the Legislature 1st Sp.Sess.1973, enacted what was then § 8–301(b) and has since, in 1986, been recodified as § 8–301(d). As part of a larger recodification, creating what is now Courts & Judicial Proceedings Article, the 1973 amendment repealed the predecessor provisions of 1957 Code (1972 Repl.Vol.) Art. 51, § 15 and replaced it with Courts & Judicial Proceedings Article, § 8–301. Section 8–301 did not simply supercede Art. 51, § 15 but significantly reformulated the rule, its new language deriving from what was then Md.Rule 746. It is necessary to examine that 1973 amendment [1] because interim changes

---

**1.** For purposes of the present opinion, it is only necessary to follow the fortunes of the four-peremptory-strikes provision from the first promulgation of § 8–301 as part of the new Courts & Judicial Proceedings Article in 1973. The Maryland practice of awarding four peremptory strikes to both the plaintiff and the defendant in a civil case actually originated with Ch. 87, § 9, Acts of the Legislature 1797. Lee v. Peter, 6 G. & J. 300, 303–304 (1834), first commented upon this statutory provision:

> "The object of the 9th section of the Act of Assembly of 1797, ch. 87, was to give to the parties, plaintiff and defendant, each the privilege of striking from the list of twenty jurors, four of the jurors, against whom no cause of challenge could be established ... Each party is authorized, without any cause of challenge, for reasons confined to his own bosom, to strike from the list of twenty jurors, the four persons whom he is least willing should sit in judgment upon his rights."

*See also* Edelen v. Gough, 8 Gill 87, 90 (1849).

Ch. 69, Acts of the Legislature 1802, extended the same right to make four peremptory challenges to the State and to the defense in the trial of all criminal cases not theretofore provided with peremptories. The Preamble to the Act explained its purpose, "Whereas it is just and reasonable that in criminal prosecutions ... the same advantage of exception to particular jurors on the pannels should be allowed as is now usefully experienced in civil cases ..." As *Hamlin v. State,* 67 Md. 333, 335–336, 10 A. 214 (1887), noted:

> "The law upon the subject is very plain. In 'all civil cases' tried before a jury, and also 'in all criminal cases where the right of peremptory challenge is not allowed,' (as it clearly is not in this, the punishment being neither death nor confinement in the penitentiary,) it is provided that ... '... the said parties or their counsel may each strike out four persons from the said list, and the remaining twelve persons shall be immediately impanelled and sworn as the petit jury in such cause.' Code, Art. 50, secs. 9, 13. And this has

elsewhere in the section have not affected the meaning of the word "party." *It means now what it meant then.*

After allotting peremptory challenges for cases involving a possible sentence of 1) death, 2) life imprisonment, and 3) twenty years or more of imprisonment, that original version of § 8-301 went on to provide:

"(b) Other cases.—In all other cases, each party is permitted four peremptory challenges; all defendants are considered a single party for this purpose.

(1) If it appears that the trial involves two or more defendants having adverse or hostile interest, the court may allow additional peremptory challenges;

(2) No defendant shall be allowed more than four peremptory challenges."

The larger legislative scheme becomes apparent when we contrast that original subsection (b) with the complementary provisions of what was then subsection. (a):

"(a) *Cases involving death, life imprisonment, or 20 years or more.*—In a trial in which the defendant is subject, on any single count, to a sentence of death, life imprisonment, or 20 years or more of imprisonment, except for common law offenses for which no specific penalty is provided by statute, each defendant is permitted 20 peremptory challenges and the state is permitted ten peremptory challenges for each defendant."

Subsection (a) dealt with the graver criminal cases, those that might involve sentences of death, life imprisonment, or twenty years or more imprisonment.[2] Subsection (b), by

---

been the law of the State ever since the Acts of 1797, ch. 87, sec. 9 . . ."

See also *Lockhart v. State,* 145 Md. 602, 613, 125 A. 829 (1924); *Beck v. State,* 151 Md. 615, 617-620, 135 A. 410 (1926).

**2.** The first statutory recognition of the peremptory challenge came with Ch. 2, Acts of the Colonial Assembly 1737. The common law right of a defendant to exercise peremptory challenges in a capital case thereby received a statutory imprimatur. Several intervening Acts of both the Colonial Assembly and the General Assembly of the sovereign state reaffirmed that grant. Ch. 162, Acts of the Legislature

contrast, dealt not simply with lesser criminal cases but also with all civil trials.[3] *See, e.g., Vaccaro v. Caple,* 33 Md. App. 413, 365 A.2d 47 (1976); *St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 74 Md.App. 353, 537 A.2d 1196 (1988), *rev'd on other grounds,* 318 Md. 337, 568 A.2d 35 (1990). In the graver criminal cases, each defendant enjoyed (and still enjoys) a two-to-one advantage over the State with respect to the allotment of peremptory challenges. Each defendant, moreover, was (and still is) treated as a separate entity in terms of qualifying for the full allotment of peremptories. The State, on the other hand, is protected against suffering anything worse than a two-to-one disparity in peremptories by the express *proviso* that "the State is permitted 10 peremptory challenges *for each defendant.*" (emphasis supplied). The Legislature manifestly knew the words to use when it wanted to multiply the State's allotments of peremptories to keep pace with the multiplication of defendants.

---

1841, extended the right of a defendant to exercise peremptories to all cases involving either felonies or penitentiary misdemeanors. That Act was incorporated in the Md.Code, Art. 51, § 15, which further provided, however, that a defendant could not challenge more than twenty jurors without assigning cause. It was Ch. 40, Acts of the Legislature 1872, that first granted the right to exercise peremptories to the State, except in the special case of Baltimore City where that right had been granted by Ch. 308, § 18, Acts of the Legislature 1860. The earlier legislative history of the peremptory challenge in Maryland has been thoroughly traced in *Turpin v. State,* 55 Md. 462 (1881). *See also Pearson v. State,* 15 Md.App. 462, 465–467, 291 A.2d 167 (1972); *Spencer v. State,* 20 Md.App. 201, 201–204, 314 A.2d 727 (1974).

**3.** The allowance of four peremptory challenges to each party in civil cases and in less grave criminal cases, by Ch. 87, § 9, Acts of the Legislature 1797, was an act of legislative grace for cases where the common law recognized no right of peremptory challenge. *Hamlin v. State,* 67 Md. 333, 334–335, 10 A. 214 (1887). In *Mitchell v. State,* 178 Md. 579, 585, 16 A.2d 161 (1940), the Court of Appeals observed:
"It will thus be seen that the intent and purpose of the law, as clearly expressed by the statute, is to give to the accused and the State, in all criminal cases in which the right of peremptory challenge is not allowed, and in all civil cases, to the parties or their counsel, the right to strike ... at least four names...."

The "other cases"—civil and lesser criminal alike [4]—were (and still are) treated far more summarily. Not only were the allotments of peremptories reduced from twenty or ten to a mere four, but the litigants on either side of the trial table were, generally speaking, reduced to being treated as a single, collective "party." But for the cases where "adverse or hostile interest[s]" were established, there was no longer any provision for multiplying the sets of peremptories by the number of defendants. Indeed, the very opposite computation was expressly directed: "all defendants are considered a single party." Similarly, the Legislature deleted any provision for the State's multiplying its sets of peremptories by the number of defendants. In looking at the language of that first version of § 8–301 as a whole, the legislative scheme is self-evident.

In the trial of the less grave criminal cases, it is to be noted that the two-to-one disparity favoring a defendant over the State had been eliminated. Criminal defendants, like their civil counterparts, were, moreover, only permitted more than one collective allotment of peremptories in those special instances where they were able to show an "adverse or hostile interest" to each other. In such a case, to be sure, the State (and by analogy the civil plaintiff) was not permitted a reciprocal enhancement or multiplication. In one sense, of course, the State had comparatively little need for such enhancement. In most cases, where there are not ordinarily codefendants with adverse interests, the State was already basking in the unaccustomed luxury of a four-to-four parity, as opposed to the two-to-one disparity it was wont to suffer in graver criminal cases.

Even where defendants with adverse interests were permitted enhanced allotments of peremptories, moreover, the State, except in the relatively rare situations where the

---

4. The similarity in treatment between civil cases and those lesser criminal cases which then embraced a category covering "nonpenitentiary misdemeanors" was observed in *Diamond State Tel. Co. v. Blake,* 105 Md. 570, 573, 66 A. 631 (1907).

aggregate defense enhancement was multiplied by a factor of three or more, was still relatively no worse off than it always had been—under the adverse two-to-one disparity—in the trial of the graver criminal cases. Even an apparent disparity adverse to the State, moreover, would not always translate into an actual disparity. It may be assumed that when two defendants were possessed of truly adverse and hostile interests, their jury selection strategies would not coincide. Their respective exercises of separate sets of peremptories, therefore, would as likely cancel each other out as impede the State in its effort to obtain the most favorable possible panel. In the isolated context of subsection (b)(1) alone, the State may appear to have suffered a reversal of fortunes. In the larger context of § 8–301 as a whole, however, it is rather the case that the State's overall improvement of fortunes was simply marginally discounted.

### The State's Argument and Its Flaws

The State now argues that the Legislature intended and, therefore, implicitly directed that the State, in the trial of multiple defendants, be considered a separate "party" for each prosecution of a separate defendant. For a number of reasons, we conclude that the legislative intent was quite otherwise.

### 1. The Stylistic Improbability:

At the outset, it is highly improbable that the Legislature would have lapsed into a passively *implicit* style in a setting where *express* words were before its very eyes in the companion subsection, where the subject matter of possible multiplication of peremptories was unmistakably before it calling for resolution, and where an explicit linguistic rhythm had already been established. In subsection (a), the Legislature had spelled out three varieties of graver criminal cases and for all three situations *expressly* provided that "the State is permitted ... peremptory challenges for each defendant." Indeed, in the subsequent (1986) restructuring of the section, the Legislature rhythmically

and repetitively sounded that cadence of awarding the State "peremptory challenges for each defendant" no less than three separate times before abruptly going silent when it came to allotting peremptories in the trial of "other cases." That sudden, pregnant silence argues loudly not for an implicit reiteration of the established refrain but for its conscious and deliberate cessation.

### 2. The Semantic Flaw:

The State also attaches what we find to be implausible significance to the switch from the use of the reference "the State," in what was then subsection (a), to the reference "party," in what was then subsection (b). The State contends that the prosecution in its manifestation as "the State" is an indivisible entity for purposes of an entire trial, be it simple or be it complex. The State argues, however, that the prosecution in its different manifestation as a "party" suddenly becomes Hydra-headed, capable of division into as many parts as the multiple defendants it is proceeding against. If they be two, it is two; if they be five, it is five. In such protean form, the prosecution's entitlement to have its procedural benefits multiply proportionately with its own multiplication of roles is, the State argues, implicit. What other purpose, we are asked, did the Legislature have in switching references from "the State" to "each party?"

The explanation for the change in terminology, however, is clear. What was formerly subsection (a) dealt only with criminal trials. Reference, therefore, to both "the defendant" and "the State" was appropriate. What was formerly subsection (b), however, dealt with civil trials as well as criminal trials. The more generic term "party," therefore, became necessary to embrace a plaintiff as well as the State and a civil defendant as well as a criminal defendant. "The State," when referred to as a "party," did not suddenly assume a different character; it simply became a member of a larger category.

To be sure, the current provision of § 8–301 dealing with "other cases" no longer embraces civil trials. Ch. 405 of the Legislative Acts of 1989 amended what is now subsection (d), which had originally been subsection (b), by adding the word "criminal." What used to be the allotment of peremptories "[i]n all other cases" is now simply the allotment of peremptories "[i]n all other *criminal* cases." (emphasis supplied). The 1989 amendment, however, did not change in any way the meaning of the phrase "each party." The legislatively intended meaning of the phrase had been infused back in the original provision, at a time when it embraced civil as well as criminal trials. That is the obvious meaning of the term "party" and the obvious reason for switching to that term when moving from the coverage of exclusively criminal trials to the coverage of all trials.

Indeed, the analogy between the State and the civil plaintiff, during that time when the subsection allotted peremptories to both in like manner, is helpful. But for the criminal-civil dichotomy, the case of *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 74 Md.App. 353, 537 A.2d 1196 (1988), *rev'd on other grounds*, 318 Md. 337, 568 A.2d 35 (1990)[5] is indistinguishable from the one at bar. In that case, there was one plaintiff, Ginny Ann Smith, just as here there is one sovereign prosecutor. In that case, the single plaintiff was proceeding against two separate defendants, just as here the State was prosecuting two separate defendants. All parties, civil or criminal and on either side of the trial table, were then subject to the provisions that "each party" would have available four peremptory challenges, subject only to the further *proviso* that multiple defendants could show adverse and hostile interests.

---

**5.** The Court of Appeals agreed with our conclusion that the awarding of an additional set of peremptory challenges to the lone plaintiff was error. It held, however, that no prejudice had been demonstrated requiring reversal because of the failure of the record extract to reveal whether the excess peremptories had actually been utilized. 318 Md. 337, 344, 568 A.2d 35 (1990).

In that case, it eventuated that each of the two civil defendants was entitled to a separate set of four peremptories. In this case, it is now automatically provided that each defendant shall enjoy a separate set of four peremptory challenges. In that case, as here, the trial judge, in what he perceived to be the interests of fairness and symmetry, awarded the plaintiff eight peremptories instead of four, in order "to keep the balance true." Precisely the same instinct moved the judge in this case to double the peremptories available to the State, instinctively calling upon a sense of balance:. "The State, it seems to me, is entitled to the same attainment of fairness as the Defendants are." Speaking, however, through Judge Garrity, we held unequivocally that the plaintiff in that case was a single party and that there was no provision in the law to permit her an enhanced portion of peremptory challenges. *St. Luke*, 74 Md.App. at 360–366, 537 A.2d 1196. We reversed the judgment because of the excessive grant of peremptories to the prevailing plaintiff. We see no principled distinction that can be be drawn between the plaintiff in that case and the State in this. No "sense of balance" or "fairness" can transmute a single "party" into multiple parties simply because multiple parties happen to be on the other side of the trial table.

### 3. The Improbability of Spontaneous Cloning:

The construction of the subsection urged upon us by the State, moreover, could work absurd results, clearly not intended by the Legislature. To urge that the prosecuting sovereignty becomes three separate incarnations or "parties" when proceeding against three codefendants is no more reasonable than to urge that the prosecuting sovereignty divides itself into three incarnations or "parties" when proceeding against a single defendant on three separate indictments. When, in a single trial, the State prosecutes a lone defendant on three separate indictments, the two adversaries do not each become a "party" three times,

entitling each to twelve, rather than four, peremptories.[6] It is implausible that the Legislature intended to multiply the incarnations of the prosecuting sovereignty, either by the number of codefendants or by the number of jointly tried indictments in the trials of lesser criminal charges.

### 4. The Improbability of Reversing the Handicaps:

The construction urged upon us by the State would have produced, prior to a 1986 amendment, yet another absurdity. If the State had, indeed, been treated as a separate "party" for each and every codefendant it prosecuted, that multiplication would not have been contingent upon whether the defendants could have multiplied their entitlements to peremptories. The multiplication would have been automatic, according to the State's preferred theory, even when nonhostile codefendants were stuck in a single collective entity. Posit then the State's proceeding against five codefendants unable, as required prior to 1986, to show any adverse or hostile interest to one another. The State's interpretation would have seen all five codefendants reduced to a paltry four peremptories among them, while the State would be luxuriating in the largess of twenty peremptories, four for each of the five prosecutions it was pursuing. A progression through § 8–301 would have revealed a disparity of peremptories adverse to the State in the trial of the graver cases being reduced not simply to parity but to the possibility of a reverse disparity (even a possibly gross disparity) in favor of the State in the trial of the lesser

---

**6.** As we observed in *Mason v. State,* 12 Md.App. 655, 680–681, 280 A.2d 753, *cert. denied,* 263 Md. 717 (1971), when a defendant made just such an untenable claim:

"The problem is one of elementary multiplication. If the most serious charge on trial is a non-penitentiary offense, the multiplicand is four and the multiplier is one, no matter how many such offenses are on trial and no matter how many defendants are on trial, unless multiple defendants have adverse or hostile interests. If the most serious charge on trial is a capital or penitentiary offense, the multiplicand is twenty; the multiplier is not the number of charges on trial but rather the number of persons on trial—in this case, one."

cases. We cannot ascribe to the Legislature any such incongruous and inexplicable intent to reverse the handicaps.

### The 1973 Legislative Intent

■ We hold that when the Legislature, in 1973, enacted what was then § 8–301(b), it intended to treat the State as a single, indivisible "party," whether the State was prosecuting 1) a single defendant on a single indictment, 2) a single defendant on multiple indictments, 3) multiple defendants on a single indictment, or 4) multiple defendants on multiple indictments. In the course of a single criminal trial, simple or complex, the State would be entitled to four peremptory challenges and no more.

### Later Amendments Have Not Changed That Meaning

The amendments to § 8–301 since its first appearance in 1973 have not altered the meaning of the word "party" or of the phrase "each party." Ch. 656, Acts of the Legislature 1986, made some substantive changes in § 8–301 and also restructured it. The former subsection (a) had been an omnibus clause, embracing the allotment of peremptories in three different situations—those involving the possibility of the death sentence, a sentence of life imprisonment, or a sentence of twenty years or more of imprisonment. That omnibus provision was broken down by the 1986 amendment into three separate subsections: (a) dealing with a possible death sentence, (b) dealing with the possibility of life imprisonment, and (c) dealing with the possibility of a sentence of twenty years or more. That restructuring down-shifted the former subsection (b), which we have been discussing, into its present position as subsection (d).

A. Reducing Peremptories for Twenty–Year Cases:

One of the substantive changes, not here pertinent, occurred in the new subsection (c). Those criminal trials involving the possibility of imprisonment for twenty years or more had theretofore been treated just like the trials

involving the possibility of death or life imprisonment, with each defendant being permitted twenty peremptory challenges and with the State being permitted ten peremptory challenges per defendant. As a result of the 1986 amendment, the new subsection (c) now provides for trials involving the possibility of a twenty-year sentence, except in those cases involving "a common-law offense for which no specific penalty is provided by statute," *ten* peremptory challenges for each defendant and *five* peremptory challenges for the State per defendant. Although the number of peremptory challenges has been reduced for that category of offense, the two-to-one disparity in favor of each defendant over the State has been maintained.

B. Simplifying the Provision for Multiple Defendants:

The most significant change effected by the 1986 amendment was with respect to the new subsection (d), the former subsection (b). As a result of the amendment, it starkly and simply provided:

"In all other cases, each party is permitted 4 peremptory challenges."

Gone was the provision that "all defendants are considered a single party for this purpose." *A fortiori,* gone also was the exemption from that provision for the case of "two or more defendants having adverse or hostile interest[s]."

Nothing in the 1986 amendment, however, affected or altered the status of the State as a single and indivisible "party." There was, on the other hand, a serious question as to what the amendment had done to the other side of the trial table. Was each defendant now a separate "party" with the right to exercise a full complement of four peremptories without any further necessity of showing a hostile or adverse interest to anyone else? Or was it rather the case that all defendants were now irredeemably submerged into collective status as a single and indivisible "party" notwithstanding hostile and adverse interests?

### a. Ambiguity As To Defendants

In a case where all that remained in the stripped-down subsection was the phrase "each party" and where no provision remained for defendants with adverse and hostile interests, it was argued that the amendment liberalized the entitlement of defendants to peremptory challenges. It was, equally plausibly, argued that the amendment austerely constricted that entitlement. The constricting argument was that the earlier *proviso* "all defendants are considered a single party for this purpose," now removed, had simply been a redundancy and that by removing all mention of a possibility for defendants to show "adverse or hostile interests," that possible exemption from the entire defense team's being treated as a single "party" had been removed. The liberalizing argument, on the other hand, was that the monolithic and indivisible interpretation of the word "party" only was tenable because of the further *proviso* that "all defendants are considered a single party for this purpose." That argument continued that with the removal of the limiting language, the word "party" was suddenly free to take on a more natural meaning as a reference to an individual litigant and not to a collection of litigants.

### b. The Original Meaning of "Party"

Language from some of the earlier opinions of the Court of Appeals supported the more constrictive interpretation and would seem to have suggested that all defendants were now, after the 1986 amendment, irredeemably subsumed into a single collective entity with a single set of peremptories. In *Hamlin v. State*, 67 Md. 333, 10 A. 214 (1887), each of two criminal codefendants was claiming the entitlement to a full and individual complement of four peremptory challenges. The trial judge declined to give them separate sets of peremptories and the Court of Appeals affirmed. As Judge Miller observed:

"The language is that the 'respective parties or their counsel may each' do this, not that every or any person may do it. The cause is one and there are two parties to

it. All who are joined as plaintiffs constitute one party, and all who are joined as defendants the other. In other words the two parties to a cause are regarded each as an integral *unit* whether consisting of one or several persons. Such is not only the obviously true construction of the language thus used, but it has been sanctioned by the uniform and universal practice of the courts ever since the statutes were passed."

*Id.,* 67 Md. at 336, 10 A. 214. The Court of Appeals went on, 67 Md. at 336–337, 10 A. 214:

"[I]f the law-makers had intended to extend this privilege to each person joined as a party to a suit they would have expressed such intention in clear and unambiguous terms. . . . We have said the question is a new one in this court, but wherever it has arisen in the courts of other States upon similar statutes, the construction we have adopted has been uniformly applied."

That statutory interpretation by the Court of Appeals in 1887 would appear to be one that should be given great deference by us today. On the issue of what the Legislature meant by the term "party," *Hamlin v. State* was looking at the same original Ch. 69, Acts of the Legislature 1802, that is the source for what has now become § 8–301(d). Between 1887 and the 1986 amendment to what became § 8–301(d), interpretative and qualifying language about treating all defendants as a single party unless they were able to show hostile or adverse interests had been added and then, as of 1986, eliminated. Shorn of the intervening modifications, the term "party" reappeared, post–1986, in the same unadorned form it had been in when interpreted by the Court of Appeals in 1887. It would seem that the meaning of the term "party," both after 1986 and in 1887, would indistinguishably be controlled by what the Legislature had intended that term to mean when it first used it in the original 1802 statute. On the question of the legislative intent behind an 1802 Act, the Court of Appeals in 1887 was almost 100 years closer than are we today to

the Annapolis climate of 1802. *See Diamond State Tel. Co. v. Blake,* 105 Md. 570, 573, 66 A. 631 (1907).

### c. *Legislative Purpose for 1986 Amendment*

Indeed, the legislative history of the 1986 amendment would also have supported the more constrictive interpretation. The Summary Committee Report of the Senate Judicial Proceedings Committee described the Bill's (Senate Bill 199) purpose as one "designed to reduce operating costs and improve efficiency in the jury selection process in the circuit courts." It summarized the Bill as one that would effect "a reduction in the number of peremptory challenges" and further pointed out that "[r]educing the number of peremptory challenges will result in substantial economic savings to the counties and Baltimore City, and will also result in far less inconvenience to the citizens of this State who are called for jury duty." Under the subheading "Legislative Intent," it stated: "The purpose of this bill is to reduce operating costs and improve efficiency in the jury selection process in the circuit courts."

A letter from Administrative Judge Joseph H.H. Kaplan pointed out that the "twenty-three judges of the Circuit Court for Baltimore City unanimously endorse" the Bill and gave as the reason for that endorsement the fact that the amendment "will result in substantial economic savings" and "will also cause far less inconvenience to the citizenry ... in that fewer jurors will have to be called for service." A letter from Baltimore City Mayor William Donald Schaefer indicated that "this administration supports Senate Bill 199" because of its belief that "it will reduce operating costs." A detailed report from the Deputy Administrator of the Circuit Court for Baltimore City analyzed the proposed legislation exclusively in terms of the dollar savings that would be effected by the reduction in the number of citizens who would have to be called for jury service. The endorsement of the Executive Council of the Bar Association of Baltimore City was based on its belief that "such a

law will result in a decrease in costs to the state and lesser demand for jurors."

In view of that legislative purpose, it seems implausible that the Legislature intended to increase, rather than reduce, the number of peremptory challenges available to codefendants in civil and lesser criminal trials. Diminishing from that argument somewhat, however, is the fact that all of the legislative attention, including the focus of the Preamble to the Act, seems to have been paid exclusively to the amendment in the new subsection (c), reducing from "20 and 10" to "10 and 5" the number of peremptory challenges available in the trial of criminal cases involving a maximum sentence of twenty years or more. In the report of the Senate Judicial Proceedings Committee, the section on "Legislative Intent" referred only to this aspect of the Bill, "The intent of this bill is to reduce by half the number of peremptory challenges that are available to a defendant and the State in a criminal trial in which the defendant is subject to a sentence of 20 years or more, but less than life." Indeed, the Preamble to the Act does not even mention the amendment to new subsection (d), dealing with "other trials." On the other hand, any interpretation of the amendment to even that neglected subsection that would increase available peremptory challenges would seem to be incompatible with a legislative intent focused exclusively on reducing costs by reducing the number of jurors called for service. The interests of the litigants apparently had nothing to do with why the Legislature passed the amendment.

### d. Resolution of the Ambiguity As to Defendants

In *Sharp v. State*, 78 Md.App. 320, 552 A.2d 1367 (1989), however, we ruled otherwise. We recognized at the outset:

"[I]t is necessary that we first review the statute and the rule as they are presently constituted and then review them in context, i.e., compare them to the statute and the rule which they replaced. That review makes patent that the term 'each party' is at least ambiguous. It could have the meaning which was deleted from the prior

statute and rule or it could mean, as alleged by appellants, the equivalent of 'each defendant'." (footnote omitted).

*Id.* In deciding as we did, we relied almost exclusively upon an interpretation of the amendment made by the Rules Committee. The Rules Committee had been considering an amendment to Rule 4–313 to keep it in conformity with § 8–301 as amended. We summarized the interpretation of the amendment made by the Rules Committee and then held:

> "In seeking the meaning of the term, it is significant that the *Rules Committee,* in its 95th Report to the Court of Appeals recommending amendment of Rule 4–313 to conform to § 8–301 as amended by the legislature, *explained one of the ways in which the legislature amended the statute, thusly: 'Second, it deletes the provision applicable to "all other cases" that all defendants are considered a single party, thus providing each defendant with four peremptory challenges, whether or not the interests of the defendants are mutually adverse or hostile.'* The Committee noted that its proposed amendment of the rule would bring the rule into conformance with the statute as amended. The Court of Appeals accepted the recommendation and adopted the proposed amendments. We hold, therefore, that both the statute and the rule contemplate that each defendant, rather than each group of defendants, be permitted four peremptory challenges."

78 Md.App. at 325–326, 552 A.2d 1367 (emphasis supplied).

In *Sharp,* each of three codefendants had requested his full and individual complement of four peremptory strikes for what would have been a grand total of twelve strikes to the defense side of the trial table. The trial judge, as in *Hamlin v. State,* 67 Md. 333, 10 A. 214 (1887), denied the request and limited the three codefendants to a combined total of four strikes. Holding that the defendants had been erroneously denied the full number of peremptory strikes to which they were entitled, we reversed. It would appear

that in *Sharp*, we, following an interpretation by the Rules Committee, "overruled" *Hamlin v. State.*

Nothing, however, in the 1986 amendment to § 8–301 affected in any way the pre-existing and ongoing status of the State as a single and indivisible party. Indeed, the legislative history of the amending Act reinforces our conclusion that the Legislature certainly did not intend to increase costs and to increase the number of jurors called for service by increasing the peremptory challenges available to the State from a single set of four to multiples of four.

C.  Exempting Civil Cases From § 8–301(d):

The final (1989) amendment to § 8–301 did not affect the meaning of the word "party" as applied to the State.  Ch. 405, Acts of the Legislature 1989 simply inserted the modifying adjective "criminal" into subsection (d), so that a provision that had theretofore covered "other cases" generally now covered only "other criminal cases."  The only effect of the amendment was to exempt civil cases from the coverage of the subsection.  The use of peremptory challenges in civil cases is covered by Md.Rule 2–512.

### The Question of Preservation

■    Ordinarily, we would now hold that permitting the State to exercise the two additional peremptory challenges was error and we would move on to the question of whether the defendant had established that the error was prejudicial.  In this case, however, there was no error.  Error can only be committed by a trial judge when he is *timely* called upon to make a ruling and then rules erroneously or fails to rule at all.  That did not occur in this case.

As we have now established, by way of extensive *dicta* for the future benefit of trial courts, the State was only entitled to four peremptory challenges.  When, in the course of the jury selection process, it challenged prospective juror No. 7, the court announced, "That was four for

the State." At that point, the appellant had exercised two of his challenges and the codefendant had exercised one.

The jury selection process then moved forward. An additional juror, No. 91, was called, was accepted by the appellant and his codefendant, and was tentatively placed in seat No. 7. Counsel for the codefendant then struck the juror tentatively in seat No. 6. Another juror, No. 92, was called and was challenged by the codefendant. It was at that point that the assistant state's attorney reminded the clerk that she was overlooking the State in the challenging process. The assistant state's attorney protested, "I believe I'm entitled to 8." The court responded, "Thank you. You're correct." The court reminded the clerk that no inquiry had been made of the State as to the acceptability of juror No. 91, then in seat No. 7. The court observed:

"The one before that—just a minute. The one before that was Juror Number [7] and I don't think the State was asked if he was acceptable, but you had been up to that point.

Is that correct, Ms. Pollack?

Ms. Pollack: That is correct.

The Clerk: 7 [seven].

The Court: All right. So, ask the State with regard to Juror Number [7].

.    .    .    .    .

The Court: No, 7 is correct. Number 7. Were you asked whether Juror Number 7 was acceptable?

Ms. Pollack: No.

The Clerk: No, that's where I didn't.

.    .    .    .    .

Ms. Pollack: No, I was not, Your Honor. Mr. Kelly is acceptable.

The Court: All right.

The Clerk: Okay. We are squared away."

No objection was made by the appellant or by the codefendant to the statement by the assistant state's attorney that

the State was entitled to eight challenges or to the ensuing procedure that recognized that alleged entitlement.

Attention then turned to juror No. 93, with the State fully participating in the challenging process without any objection from either defendant:

"The Clerk: Juror Number 93. Acceptable to the State?

Ms. Pollack [for the State]: Acceptable.

The Clerk: Acceptable to Defense 1?

Ms. Deboissiere [for the codefendant]: Acceptable.

The Clerk: Acceptable to Defense 2?

Ms. Berlin [for the appellant]: Acceptable."

The State continued to be an expressly recognized player in the peremptory selection process without a peep of protest from either opposing player.

The juror in seat No. 10 was then challenged by the appellant's use of his third peremptory strike. Juror No. 94 was called and challenged by the appellant's use of his fourth and final strike. It was announced and accepted by all parties that the appellant was at that point out of the game. Juror No. 95 was then called and deemed acceptable both by the codefendant and by the State, which continued as an active participant in the process without objection.

It was at that point that the clerk asked whether the panel was acceptable to the State. The State then exercised its fifth peremptory challenge by striking prospective juror No. 4. Counsel for the codefendant spoke up, "Your Honor, I'm sorry, I thought the State had exhausted her strikes." The court responded, "You each get four. The State gets eight." There was no objection by the codefendant to that response by the court and it is highly questionable whether even the codefendant would have adequately preserved the issue for appellate review. What is unquestionable is that the appellant raised no objection whatsoever. The selection process went forward. Three additional jurors were called. The codefendant exercised his fourth and final challenge and then retired to the sidelines.

The process went forward with only the State continuing to participate. Twelve jurors were tentatively in the box but the panel as a whole had not yet been accepted by the State. When the clerk went to call another prospective juror for possible acceptance as an alternate, the State pointed out that it had not yet completed its process of accepting or challenging the original panel. No one objected. The State then exercised its sixth peremptory challenge to unseat one of the jurors who had been tentatively seated. The State then accepted another juror to fill that vacancy. The State, and the State alone, was then called upon to decide whether the panel was ultimately acceptable:

"The Clerk: Okay. Juror Number 107. Acceptable to the State?

Ms. Pollack: For what seat?

The Clerk: Alternate.

Ms. Pollack: I don't believe I was asked if the panel was acceptable.

The Court: No, you weren't.

The Clerk: Oh, I'm sorry. Is the panel acceptable to the State?

Ms. Pollack: One moment, please. Respectfully challenge Number 4.

The Sheriff: Let me have your badge, sir.

The Clerk: Juror No. 107. Acceptable to the State?

Ms. Pollack: Acceptable.

The Clerk: Seat Number 4. Is the panel acceptable to the State?

Ms. Pollack: The panel is acceptable, Madam Clerk."

Throughout that entire process, there was no objection by either defendant. In the meantime, the prospective jurors who had been earlier challenged had left the courtroom and returned to the jury assembly room.

With the primary jury panel now accepted, attention turned to the distinct procedure of selecting an alternate. One prospective alternate juror was called and challenged by the State. A second prospective alternate juror was

called and challenged by the codefendant. A third prospective alternate juror was called and accepted by all three parties. Since only one alternate was to be seated, the jury selection process was at that point complete except for the actual swearing of the jury.

It was only then, for the first time, that the appellant raised any objection to the utilization by the State of a fifth and sixth peremptory challenge. At a bench conference, counsel for the appellant observed:

"I'm somewhat confused. This just doesn't seem right. I thought each side got four strikes. I'm just looking at the rule book. I don't understand how the State gets eight."

The appellant's grievance was not particularly well focused on the Maryland Rule but simply expressed a sense of vague unease, "We are sitting there, she keeps on striking and it just doesn't seem quite right." The appellant then did lodge a formal objection.

We hold that the objection was not timely made, Md.Rule 4–323(c), and that the issue is not properly preserved for appellate review. At the time the appellant finally objected, there was nothing the trial judge could do about the matter. Jurors earlier challenged could hardly be recalled and seated. There would be a question of which jurors then seated should be unseated. There would be a question of whether one of the unseated jurors should, in turn, unseat the alternate. There was, of course, always the possibility that the dismissed jurors had been sent home for the day, thus ending their jury service. There was also the possibility that the dismissed jurors had been sent to another courtroom and, possibly, even impaneled to hear another case. When the judge was finally called upon to rule upon the appellant's objection, there was no remedy available. "The moving finger writes, and having writ, moves on."

### Trial In Absentia

■ The appellant's second contention is that the trial was erroneously permitted to proceed in his absence. There

is no merit in the contention. The appellant was present throughout the first day of trial, December 12, 1991. He was fully aware that he was due back when the trial resumed the following morning. On December 13, he failed to appear. His codefendant, who was also his brother, had seen him in the hallway just five minutes before the case was called. The trial proceeded in his absence. At his sentencing hearing seven months later, the appellant explained that he had passed out from a drug overdose.

Maryland Rule 4–231(c) makes clear that a defendant who voluntarily absents himself from a proceeding, after it has begun in his presence, has waived his right to be present. Under the circumstances of this case, we see no error.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.